UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

              :

**EDWIN GUTIERREZ**,
              :

               Petitioner,
              :

              :   **MEMORANDUM DECISION AND ORDER**

        – against –
              :

              :   20-CV-4434 (AMD)

**JAY JOHNSON**, *superintendent of Green Haven*
*Correctional Facility*,
              :

               Respondent.
              :

------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

The *pro se* petitioner, currently incarcerated at Green Haven Correctional Facility, petitions for a writ of habeas corpus under 28 U.S.C. § 2254.  A jury convicted the petitioner of two counts of second-degree murder, one count of first-degree robbery and one count of third-degree attempted grand larceny.  He was sentenced to concurrent terms of 25 years to life on each murder count, 25 years on the robbery count, and 2 to 4 years on the attempted grand larceny count.  The petitioner argues that (1) the convictions were not supported by legally sufficient evidence; (2) the court did not properly instruct the jury on the elements of the attempted grand larceny charge; (3) the court violated his right to a fair trial when it permitted testimony that "was calculated to appeal to the passion and sympathy of the jury;" and (4) his sentence was excessive. *See People v. Gutierrez*, 172 A.D.3d 1094, 1095 (2d Dep't 2019).  For the reasons that follow, the petition is denied.

# BACKGROUND[1]

At approximately 5:00 a.m. on November 28, 2014, Dionel Ramirez drove to a 7-Eleven in Bay Shore, Suffolk County to pick up baked goods for the homeless. While he was in the store, the petitioner got into Mr. Ramirez's car and began to reverse out of the parking spot. Mr. Ramirez ran out of the store, stood in front of the car and waved his hands above his head, telling the petitioner to stop. The petitioner put the car in drive, stepped on the gas and ran over Mr. Ramirez, killing him instantly. The entire incident was caught on the store's surveillance tape. The petitioner admitted that he was the person on the tape but argued that he did not know what he was doing because he was severely intoxicated. The petitioner was convicted of two counts of second-degree murder (depraved indifference and felony murder) and first-degree robbery.

About an hour before the petitioner stole Mr. Ramirez's car, he tried to steal another car from the same parking lot, but it had a manual transmission which the petitioner could not operate. The car's owner was able to stop the petitioner without a physical altercation. The petitioner was convicted of third-degree attempted grand larceny.

## I.     The Trial

### A.  The Prosecution's Case

The petitioner went to trial before the Honorable William J. Condon and a jury. The prosecution called seventeen witnesses: the victim's wife Blanca Ramirez; Officer Steven D'Amico, who was a friend of the victim; eyewitnesses Celso Arriaza, Reyna Hernandez, Parvez Khan, Craig Philipopoulos, Sarah Burgos and Lynette Taylor; paramedic Frank Abbate; Dr. Paul Mellen, who performed the autopsy; Officers John Peterson and Larry Ruiz, who investigated

---

[1]  Because the petitioner was convicted, I summarize the facts in the light most favorable to the verdict. *Garbutt v. Conway*, 668 F.3d 79, 80 (2d Cir. 2012).

the crime; forensic scientists Jennifer Tripoli and Joseph Galdi, who processed DNA samples; Azhar Chaudary, owner of the 7-Eleven; Howard Jeffers, who installed the security cameras at the 7-Eleven; and Myra Sanchez, the petitioner's cousin. Their testimony established the following facts.

On November 27, 2014—Thanksgiving Day and the petitioner's birthday—the petitioner took a train from New York City to Brentwood to celebrate the holidays with his cousin, Myra Sanchez. When the petitioner arrived at Ms. Sanchez's home, he looked as though he had "drank some" on the train, "but he wasn't intoxicated." (July 26, 2016 Tr. at 9.) The petitioner stayed with Ms. Sanchez "from seven until ten or eleven" that evening; the two drank some beer and Hennessy, but "[n]ot that much." (*Id.* at 9–11.)

The next day, around 4:45 a.m., Celso Arriaza drove his girlfriend's Pontiac to a 7-Eleven located at 148 Pine Air Drive in Bay Shore. (July 21, 2016 Tr. at 48, 56.)[2] He went into the store, but left the car running because it was cold outside. When he came out, the petitioner was sitting in the driver's seat. (*Id.* at 48.) Mr. Arriaza walked to the car, opened the door, elbowed the petitioner in the face and pulled the emergency brake. (*Id.* at 48–49.) The petitioner got out of the car and called Mr. Arriaza "crazy for leaving [his] car running," because "someone might steal it." (*Id.* at 48–49.) They argued for a few minutes, standing about "a foot apart," but the incident did not escalate any further. (*Id.* at 58.) The petitioner did not have any trouble speaking, did not slur his words, and did not smell like he had been drinking. (*Id.* at 58–59.) However, the petitioner's eyes were "wide open and watery" and he "appeared to be on drugs." (*Id.* at 63.)

---

[2] Reyna Hernandez, Mr. Arriaza's girlfriend, testified that she bought the Pontiac for approximately $7,500 a couple months earlier. (July 21, 2016 Tr. at 45.)

About fifteen minutes later, the petitioner went into the 7-Eleven and asked to use the phone to call a taxi.  (*Id.* at 68.)  Parvez Khan, the cashier, dialed the phone for the petitioner but did not know whether the petitioner was able to get a taxi.  (*Id*. at 70.)  The petitioner stole some candy when Mr. Khan was not looking and left the store.  (*Id.*)  The petitioner had a fifteen-minute conversation with Craig Philipopoulos, who was standing outside.  (*Id*. at 82–84.)  According to Mr. Philipopoulos, the petitioner was in a "very big rush" and kept asking him "when the cabs are coming."  (*Id*. at 84–85.)  The petitioner did not appear to be intoxicated; he stood up straight and did not stagger or have any problem walking.  (*Id.* at 87.)

The petitioner was "asking other people for rides;" when that "didn't work," the petitioner tried to break into cars.  (*Id.*)  After several tries, the petitioner found a car that was unlocked, "jump[ed]" into it and "pulled it in reverse."  (*Id.* at 88.)  As the petitioner was pulling out, Mr. Ramirez ran out of the 7-Eleven.  (*Id.*)  He "got in front of the hood" of his car and "scream[ed] stop."  (*Id.*)  The petitioner drove forward, "run[ning] over" Mr. Ramirez.  (*Id.*)  Sarah Burgos, who had just pulled into the parking lot with Lynette Taylor, also saw the petitioner run over Mr. Ramirez, who had his hands up right before the petitioner struck him with the car.  (July 25, 2016 Tr. at 52.)  Ms. Burgos screamed and ran over to Mr. Ramirez, while Ms. Taylor ran into the 7-Eleven and called 911.  (*Id.* at 60.)[3]  A surveillance camera captured the homicide, and the footage corroborated the witnesses' testimony.  (July 21, 2016 Tr. at 32; July 25, 2016 Tr. at 63.)

Paramedic Frank Abbate arrived at around 5:50 a.m.  (July 25, 2016 Tr. at 6.)  By that time, Mr. Ramirez had no pulse and was in cardiac arrest.  (*Id.* at 7, 9.)  Mr. Abbate drove the victim to Southside Hospital, where he was pronounced dead.  (*Id.* at 7–9.)  Dr. Paul Mellen, a

---

[3]  Ms. Taylor did not see the petitioner run over Mr. Ramirez because she was driving.

4

forensic pathologist with the Suffolk County Medical Examiner, performed the autopsy.  (*Id*. at 15.)  Mr. Ramirez sustained injuries that were consistent with being run over by a car.  (*Id.* at 24, 38.)  He died from "the head injuries, skill fractures [and] brain hemorrhage."  (*Id.* at 37.)[4]

Around 8:30 a.m., Officer Larry Ruiz found Mr. Ramirez's car about two miles from the 7-Eleven, "parked correctly" in someone's driveway.  (*Id.* at 73, 81–82.)  Forensic testing established that Mr. Ramirez's and the petitioner's DNA was in the car.  (*Id.* at 46–50.)

Blanca Ramirez, Mr. Ramirez's wife, described the make and model of Mr. Ramirez's car.  She also described their Thanksgiving celebration the night before Mr. Ramirez was killed, and testified generally that Mr. Ramirez was a charitable person and a good husband and father.  (July 20, 2016 Tr. at 49–59.)  Officer Steven D'Amico met Mr. Ramirez several years earlier, at the very same 7-Eleven, when Mr. Ramirez was collecting food for the homeless.  Officer D'Amico believed that is why Mr. Ramirez went to the 7-Eleven the morning he was killed.  (*Id.* at 66.)[5]

## B.  The Defense Case

The petitioner was the only defense witness.  He testified that he had a drinking problem, and drank heavily and used cocaine the night before he killed Mr. Ramirez.  (July 27, 2016 Tr. at 10, 13.)  He "snort[ed] cocaine in the bathroom" on the train, "mixed beer with the Hennessy" at his cousin's home, and drank some more at a party next door to his cousin's house.  (*Id.* at 10–12.)  The petitioner conceded that he was the person on the security footage but claimed that he

---

[4]  Mr. Ramirez's blood alcohol level was 0.10 percent, which was over the legal limit.  (*Id.* at 37.)

[5]  Before the trial, defense counsel moved to preclude Mrs. Ramirez and Officer D'Amico from testifying, because the only purpose of their testimony was to elicit sympathy from the jury; counsel objected again at the trial.  (*Id.* at 5–6, 51–52, 65.)  Judge Condon ruled that the testimony was "part of the narrative."  (*Id.* at 6, 52, 65.)  The testimony of both witnesses spanned 21 pages of the 518-page transcript.

must have blacked out; he did not remember how he got to the 7-Eleven or what happened in the

parking lot.  He also conceded that the footage showed him walking steadily and driving through

a crowded parking lot without hitting anyone else, but claimed that he could "walk normally"

when he drank.  (*Id.* at 21–25.)  He remembered waking up at his cousin's place late the next day

(*id.* at 10, 13), but did not remember that his cousin accused him of killing Mr. Ramirez when he

woke up or that he told the investigating detective about his cousin's accusation (*id.* at 33–38).

The petitioner asserted that "the first time" he realized that he had killed someone was during the

interview with Detective Balistreri on December 6, 2014.  (*Id.* at 34–35.)  He apologized to Mr.

Ramirez's family and stated that he never wanted to hurt anyone.  (*Id.* at 13.)

### C.  The Rebuttal Case

Detective Andrew Balistreri interviewed the petitioner on December 6, 2014.  After he

advised the petitioner of his *Miranda* rights, the petitioner said that "he knew he was in a lot of

trouble, that he killed a guy;" the petitioner did not remember killing anyone because he had

been drinking, but his cousin told him that he did.  (July 28, 2016 Tr. at 11, 14.)  The petitioner

also told Detective Balistreri that he sometimes "did cocaine" but did not say that he had done so

the day before the incident.  (*Id.* at 12, 17.)

### D.  Jury Instructions

Judge Condon instructed the jury on the elements of felony murder, depraved

indifference murder, first-degree robbery and third-degree attempted larceny.  (Aug. 1, 2016 Tr.

at 93–114.)  The court gave the following charge on attempted grand larceny:

> Under our law, a person is guilty of Grand Larceny in the Third Degree when that
> person steals property and when the value of the property exceeds $3,000.  A person
> steals property and commits larceny when with the intent to deprive another of
> property or to appropriate the same to himself or herself, such person wrongfully
> takes, obtains or withholds such property from an owner of the property.
>
> . . .

6

> Under our law, a person is guilty of an attempt to commit a crime when with the intent to commit that crime he or she engages in conduct which tends to effect the commission . . . of the intended crime. . . . Conduct which tends to effect the commission of a crime means conduct which comes dangerously close or very near to the completion of the intended crime. . . .
>
> . . .
>
> In order for you to find the defendant guilty of the crime of Attempted Grand Larceny in the Third Degree, the People are required to prove from all the evidence in the case beyond a reasonable doubt both of the following elements:
>
> One.  That on or about November 28, 2014, in the County of Suffolk, the defendant Edwin Gutierrez intended to commit the crime of Grand Larceny in the Third Degree.
>
> And, two.  That the defendant engaged in conduct which tended to effect the commission of that crime.

(*Id*. at 109–10, 112–13.)  Judge Condon also instructed the jurors that "intoxication is not as such a defense to a criminal charge," but that they could consider "evidence of the defendant's intoxication . . . whenever it is relevant to negate an element of the crime charged," including the defendant's state of mind.  (*Id.* at 103.)

Judge Condon asked the parties if they had any objections to the jury charge; neither side objected.  (*Id.* at 121.)

### E.  Verdict and Sentencing

On August 2, 2016, the jury convicted the petitioner of all four counts.  (Aug. 2, 2016 Tr. at 8–13.)  Defense counsel moved to set aside the verdict, claiming that "the People failed to formulate a prima facie case;" Judge Condon denied the application.  (*Id.* at 13.)

At the September 17, 2016 sentencing, the defendant repeated that he blacked out and that "[w]hat happened was an accident."  (Sept. 17, 2023 Tr. at 8.)  He apologized to Mr. Ramirez's family and told Judge Condon that he did not "deserve the 25 to life" because he only committed "manslaughter."  (*Id.* at 8–9.)  Judge Condon observed that the petitioner "didn't look blacked out" on the videotape, and that he tried to steal other cars before he got to Mr. Ramirez's

car.  (*Id.* at 10.)  The court rejected the petitioner's characterization of the crime as an accident or manslaughter; it was "murder," and a "jury of [the petitioner's] peers defined it as such."  (*Id.* at 10–11.)

The Court sentenced the petitioner as a predicate violent felony offender to concurrent, indeterminate terms of 25 years to life on each murder count, a concurrent, determinate term of 25 years with 5 years of post-release supervision on the robbery count, and a concurrent indeterminate term of 2 to 4 years on the attempted grand larceny count.  (*Id*. at 11–12.)

## II.    The Appeal and Application for Leave to Appeal

In February 2018, the petitioner, represented by counsel, appealed his conviction to the Appellate Division, Second Department.  (ECF No. 8-3 at 1–34.)  The petitioner argued that (1) the conviction for depraved indifference murder was not supported by legally sufficient evidence and was against the weight of the evidence; (2) the conviction for felony murder and first-degree robbery should be reversed because the prosecution did not prove that the petitioner forcibly stole Mr. Ramirez's car; (3) the conviction for third-degree attempted grand larceny should be reversed because the prosecution did not establish that Mr. Arriaza's car was worth $3,000 or more; (4) the trial court's instructions on attempted grand larceny deprived him of a fair trial; (5) the testimony of Blanca Ramirez and Steven D'Amico was unduly prejudicial; (6) and his sentence was excessive.

The Second Department affirmed the conviction on May 15, 2019.  *Gutierrez*, 172 A.D.3d at 1094–95.  The court rejected the petitioner's claims about the sufficiency of the evidence as "unpreserved for appellate view" and "in any event . . . without merit."  *Id.* at 1094.  Conducting "an independent review of the weight of the evidence with regard to the defendant's convictions," the court concluded that "the verdict of guilt was not against the weight of the evidence."  *Id*. (citations omitted).  The court also found that the petitioner's challenge to the jury

instructions was "unpreserved for appellate review." *Id*. at 1094–95.  The court "agree[d]" that the trial judge "should not have allowed testimony from the victim's wife and Officer D'Amico," but concluded that their testimony was "harmless beyond a reasonable doubt." *Id*. at 1095. Finally, the court held the sentence was not excessive. *Id*.

The Court of Appeals denied the petitioner's application for leave to appeal on August 22, 2019.  (ECF No. 8-3 at 83.)

## LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act ("AEDPA") limits the authority of federal courts to grant writs of habeas corpus to state prisoners.  Section 2254(a) permits a federal court to entertain only those applications claiming violations "of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  AEDPA's standards are "difficult to meet;" the Act sets up a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (cleaned up).  A federal court may not "review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  This bar applies to substantive and procedural state law grounds alike.  *Id*. at 729–30.

As for claims that have been "adjudicated on the merits in State court proceedings," a federal court may not issue a writ of habeas corpus unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *Cullen*, 563 U.S. at 181 (quoting 28 U.S.C. § 2254(d)).  Federal court review "is

limited to the record that was before the state court that adjudicated the claim on the merits," and

the petitioner carries the burden of proof.  *Id.* at 180–81.

## DISCUSSION

The petitioner raises the same claims he made on appeal to the Second Department: that

the evidence against him was insufficient, the trial court's final instructions to the jury were

flawed, certain testimony was unfairly prejudicial, and his sentence was excessive.  (ECF No. 1

at 5–7.)

## I.   Legal Sufficiency of the Evidence Adduced at Trial

The petitioner argues that the evidence was legally insufficient to establish his guilt on

any of the four counts.  This argument is procedurally barred and, in any event, meritless.

### A.  Petitioner's Claim Is Procedurally Barred

In opposing the petitioner's appellate claim that the evidence against him was legally

insufficient, the prosecution argued that the petitioner "fail[ed] to alert the trial court to specific

deficiencies in the evidence at the close of the People's case" because he made only a general

motion to set the jury's verdict aside on the ground that "the People failed to formulate a prima

facie case."  (ECF No. 8-3 at 54 (cleaned up) (collecting New York cases)).  Moreover, the

petitioner "made no motion for a trial order of dismissal at the conclusion of the People's case,

nor did he make such a motion after the defense case or the People's rebuttal."  (*Id.*)  And

although defense counsel argued that he "reserved" the argument "for this point" in the trial, the

record "reveals no evidence" that counsel ever made such a motion.  (*Id.*)  Thus, the prosecution

argued, the petitioner's claims about the sufficiency of the evidence were "unpreserved."  (*Id.*

(collecting New York cases).)

The Second Department agreed, finding that the petitioner's "contentions regarding the

legal insufficiency of the evidence are unpreserved for appellate review and in any event, are

without merit." *Gutierrez*, 172 A.D.3d at 1094 (citations omitted).  "The Second Circuit has

determined that New York's preservation rule is an independent and adequate state procedural

ground ordinarily barring habeas review." *Read v. Thompson*, No. 13-CV-6962, 2016 WL

165716, at *10 (S.D.N.Y. Jan. 13, 2016) (cleaned up).  This is so even if the state court goes "on

to also deny the claim on the merits." *Vinson v. Brown*, No. 07-CV-2972, 2011 WL 7640001, at

*8 (S.D.N.Y. 2011).  Accordingly, the Court must "decline to hear" any claims regarding the

legal sufficiency of the evidence, because they were "not presented to the state courts consistent

with the State's own procedural rules." *Shinn v. Ramirez*, 142 S. Ct. 1718, 1732 (2022).

A petitioner can overcome this procedural bar by showing "cause for the default and

actual prejudice as a result of the alleged violation of federal law" or by demonstrating "that

failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501

U.S. at 750 (citations omitted).  In order to establish "cause" for a procedural default, the

petitioner must show that "some objective factor external to the defense impeded" his effort to

comply with the state procedural rule in state court.  *Murray v. Carrier*, 477 U.S. 478, 488

(1986).  For "actual prejudice," a petitioner must show that "errors at his trial . . . worked to his

actual and substantial disadvantage, infecting his entire trial with error of constitutional

dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982).  Finally, to establish a

"fundamental miscarriage of justice," a petitioner must show that "a constitutional violation has

probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496.

The petitioner has not established that any of these exceptions apply.[6]

---

[6] Citing *Daye v. Att'y Gen. of State of N.Y.*, 696 F.2d 186, 196 (2d Cir. 1982), the petitioner argues that
he preserved his challenge to the sufficiency of the evidence, because his arguments before the Second
Department and the New York Court of Appeals were "sufficient to alert" those courts as to the
substance of the petitioner's arguments.  *Daye* is a case about exhausting state remedies, which is not an
issue in this case.  The petitioner's claims are barred because he did not raise them with the trial judge.

**B.  The Evidence Was Legally Sufficient**

Even had the petitioner preserved his claims, the Second Department properly rejected them as meritless.  A court faced with a legal sufficiency argument does not ask "whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citation omitted).  Rather, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citation omitted).  The evidence in this case easily meets that standard.

*i.      Depraved Indifference Murder*

To establish depraved indifference murder, the prosecution was required to prove that the defendant, under "circumstances evincing a depraved indifference to human life . . . recklessly engage[d] in conduct which create[d] a grave risk of death in another person, and thereby cause[d] the death of another person."  N.Y. P.L. §125.25(2).  The petitioner argues that the prosecution did not prove that he acted with depraved indifference because he was too intoxicated to know what he was doing.  (ECF No. 1 at 5.)  The jury heard this argument and rejected it.  As an initial matter, intoxication in and of itself is not a defense, as the trial judge explained to the jury.  Rather, intoxication is relevant only insofar as it negates an element of the crime.  In this case, the petitioner claimed that he was so intoxicated that he could not have formed the requisite intent.  However, the evidence showed that the petitioner was able to make decisions and execute them, even if he had been drinking.  Multiple witnesses, including the petitioner's cousin, testified that the petitioner did not appear to be intoxicated.  And while Mr. Arriaza—the owner of the first car that the petitioner tried to steal—speculated that the petitioner might have been under the influence of drugs, he also said that the petitioner told him that he should not have left his car running, which was an entirely reasonable observation.  The

petitioner was able to ask to use a telephone to call for a taxi, and then had a long and coherent conversation with Craig Philipopoulos.  Moreover, the video evidence showed the petitioner walking steadily without staggering and maneuvering a car through a crowded parking lot without hitting anyone else.  He also knew enough not to park the victim's car at his cousin's house, leaving it in a stranger's driveway instead.

The petitioner testified that he took cocaine and drank so heavily in the hours leading up to the homicide that he could not remember anything and did not know what he had done.  His testimony was refuted by the testimonial and video evidence, and by Detective Balistreri's rebuttal testimony.  The jury heard the evidence, as well as the arguments of counsel, and concluded that the petitioner's guilt was proven beyond a reasonable doubt.  That was a rational decision, based on the evidence.

ii.     *Felony Murder and Robbery*

The petitioner contends that his convictions for robbery and felony murder must be reversed, because the evidence did not establish that he used force to steal the victim's car.  Under New York law, a person is guilty of "forcible stealing" if he takes the property by force or uses force to retain it "immediately after the taking."  P.L. §160.00.  Consistent with that definition, New York courts have held that juries can "infer that [a defendant's] purpose in using force was to retain control of the stolen property, not merely to escape" if the "defendant was in possession of the stolen property" when he used force.  *See People v. Sullivan*, 119 A.D.3d 1335, 1336 (4th Dept. 2014) (upholding robbery conviction where a defendant threatened use of force against store security personnel on way out of the store).

The evidence established that the petitioner had a motive to keep the car—his desire to get back to Manhattan.  Indeed, he was so anxious to get back that he was willing to steal a car

when he could not get a taxi.  Accordingly, the jury had sufficient evidence from which to

conclude that when the petitioner used force—running over the victim—he was trying to

"ret[ain]" the car.  P.L. §160.00; *see also People v. Onorati*, 15 A.D.3d 216, 217 (1st Dep't

2005) ("The jury could have reasonably concluded that defendant used force to simultaneously

flee from the victim and to retain the stolen property, and that his actions constituted force within

the meaning of the robbery statute.").

      *iii.*    *Attempted Grand Larceny*

Finally, the prosecution presented sufficient evidence that the first car the petitioner

attempted to steal was worth more than $3,000.  Reyna Hernandez, the car's owner, testified that

she bought it for approximately $7,500 a few months before the homicide.  Under New York

law, if "the cost of the automobile is substantially above the monetary value prescribed by the

applicable penal statute and other facts adduced at trial, such as the description of the condition

of the property at the time of the theft and the period of time which elapsed between the date of

purchase and the date of the theft, negate the possibility that the vehicle's market value has

significantly depreciated, there exists sufficient evidence from which the jury could infer, beyond

a reasonable doubt, that the market value of the car at the time and place of the theft was in

excess of the statutory minimum necessary to sustain a conviction."  *People v. James*, 111

A.D.2d 254, 255–56 (2d Dep't 1985).[7]

---

[7] The petitioner suggests that the guilty verdicts were "against the weight of the evidence."  (ECF No. 1 at 2.)  Unlike the legal sufficiency claim, which is based on federal due process principles, a weight of the evidence argument is grounded in state law, N.Y. C.P.L. § 470.15(5).  *Compare Jackson*, 443 U.S. at 318–19 (Fourteenth Amendment requires record evidence to reasonably support a finding of guilt beyond a reasonable doubt), *with People v. Bleakley*, 69 N.Y.2d 490, 495 (1987) (weight of the evidence is based on the court's factual review power).  Accordingly, this Court has no authority to review such a claim.  *See* 28 U.S.C. § 2254(a) (federal habeas corpus review available only where the petitioner has alleged a violation of "the Constitution or laws or treaties of the United States"); *Correa v. Duncan*, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001) (declining to review a weight of the evidence claim).  In any event, the petitioner does not make a separate argument on this ground.

## II.      Jury Instruction

In charging the jurors on attempted grand larceny, the trial court defined the elements of a completed grand larceny, including that the value of the property exceeded $3,000.  When he described the elements of attempted grand larceny, the judge did not repeat the value instruction. As he did in the Second Department, the petitioner argues that these instructions did not adequately convey that the jury had to make a finding about the value of the property.  The Second Department rejected this claim as "unpreserved for appellate review," because the petitioner did not object to the jury charge at trial.  *Gutierrez*, 172 A.D.3d at 1094–95 (citations omitted).  To preserve a claim for appeal, a party must register an objection at the trial, when the court has an opportunity to remedy any error.  N.Y. C.P.L.R. § 470.05(2); *see also People v. O'Hara*, 96 N.Y.2d 378, 383 (2001).  As explained above, the petitioner did not object to the jury charge.  Accordingly, the state court's determination that the petitioner did not preserve his objection is an independent and adequate state ground that precludes habeas review in this Court. *See Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011).  Nor does the petitioner demonstrate cause for the default, actual prejudice or that failure to consider the claims will result in a fundamental miscarriage of justice.

In any event, the petitioner's argument is not persuasive.  To succeed on a state jury-instruction claim in a federal habeas court, a petitioner must establish that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  *Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973).  The petitioner has not made that showing.  First, the challenged instruction pertained to one element of one count—attempted third-degree grand larceny, the least serious charge in the indictment—so it could not have "infected the entire" trial.  Second, the trial court in fact instructed the jury that "a person is guilty of grand larceny in the third degree when that person steals property and when the value of the property exceeds

$3,000," even if the court did not repeat that instruction after discussing attempt.  (Aug. 1, 2016

Tr. at 109.)  Under these circumstances, the jury could "gather from [the Court's] language the

correct rules which should be applied in arriving at [its] decision."  *People v. Ladd*, 89 N.Y.2d

893, 895 (1996).

### III.    Testimony of the Victim's Wife and Friend

The petitioner argues, as he did on appeal, that the trial court should not have permitted

the victim's wife and friend to testify about the victim's good character.  The Second Department

agreed that the testimony "had no bearing on the materiality of the issues before the jury" and

improperly "appeal[ed] to the passion and sympathy of the jury."  *Gutierrez*, 172 A.D.3d at 1095

(citations omitted).   Nevertheless, the court found that "the error was harmless beyond a

reasonable doubt."  *Id.* (citations omitted).

To state a claim in federal habeas court based on an evidentiary error, a petitioner must

show that the challenged evidence was so prejudicial that the "conviction violated the

Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

In this case, the Second Department concluded that the error in admitting the evidence was

harmless.  Accordingly, the petitioner can succeed on this claim only if he demonstrates that the

error "resulted in 'actual prejudice'" "in light of the record as a whole."  *Brecht v. Abrahamson*,

507 U.S. 619, 637 (1993) (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)).

The petitioner cannot meet this standard.  Blanca Ramirez and Steven D'Amico testified

on the first day of the trial, and both witnesses were brief.  While portions of their testimony

might have elicited undue sympathy, the evidence of the petitioner's guilt was not just "weighty"

but "overwhelming."  *Id.* at 639.  As discussed above, multiple witnesses watched as the

petitioner ran over the victim, and the crime was captured on video.  The petitioner's defense—

that he was too intoxicated to know what he was doing—was refuted by the evidence, both video

16

and testimonial.  Under these circumstances, the Second Department was correct to conclude that the brief testimony did not require a new trial.

## IV.    **Excessive Sentence**

The petitioner also challenges his sentence as excessive.  "It is well-established that when a sentence falls within the range prescribed by state law, the length of the sentence generally may not be raised as a basis for federal habeas relief."  *Silva v. Keyser*, 271 F. Supp. 3d 527, 545 (S.D.N.Y. 2017); *see also White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (per curiam) ("No federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law.").  Because the petitioner's sentence falls within the New York's statutory range, this Court has no authority to review his claim.

## CONCLUSION

For these reasons, the petition for a writ of habeas corpus is denied in its entirety.  The case is dismissed.  A certificate of appealability will not be issued.  *See* 28 U.S.C. § 2553(c).

**SO ORDERED.**

s/Ann M. Donnelly
_____
Ann M. Donnelly
United States District Judge

Dated: Brooklyn, New York
       September 29, 2023